IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

TISHA ANDERSON on behalf of        )        No. 08 C 50012
CODY ANTONIO EDGESTON,             )
                                   )
                                   )
           Plaintiff,              )
     vs.                           )        Judge Frederick J. Kapala
                                   )        (Magistrate Judge P. Michael
MICHAEL J. ASTRUE,                 )        Mahoney)
Commissioner of Social Security,   )
                                   )
           Defendant.              )

## MEMORANDUM OPINION AND ORDER

## I.     Introduction

Tisha Anderson, for her minor son, Cody Edgeston, seeks judicial review of the Social

Security Administration Commissioner's decision to deny Cody's application for Supplemental

Security Income (hereinafter "SSI") under Title XVI of the Social Security Act.  *See* 42 U.S.C.

§§ 1383(c)(3), 1381a.  This matter is before the Magistrate Judge pursuant to the consent of both

parties, filed on May 27, 2008.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## II.    Administrative Proceedings

Cody Edgeston applied for supplemental security income on April 25, 2005, alleging that

he became disabled on April 13, 2005.  (Tr. 106.)  The Social Security Administration

(hereinafter "SSA") denied Cody's application initially and upon reconsideration.  (Tr. 6.)   The

Administrative Law Judge (hereinafter "ALJ") conducted a hearing into Cody's application for

benefits on May 10, 2006, at which Cody was represented by his mother.  (Tr. 255–63.)

However, the ALJ adjourned and rescheduled the hearing to allow Ms. Anderson to gather

1

medical records. (Tr. 262–63.) On March 22, 2007, the ALJ held a video hearing where Cody

and his mother testified. (Tr. 265–89.) Although the ALJ informed Plaintiff of her right to

representation, she chose to appear and testify without an attorney. (Tr. 255–56, 267–68.) The

ALJ issued a written decision denying Cody's application on April 27, 2007, and finding that

Cody does not have an impairment or combination of impairments that meet, medically equal, or

functionally equal the listings in 20 C.F.R. Part 404, subpt. P, app. 1. (Tr. 17–28.) The Appeals

Council denied review on August 31, 2007. (Tr. 10–12.) Because the Appeals Council denied

review, the ALJ's decision denying Cody benefits constitutes the final decision of the

Commissioner. (Tr. 10.)

## III.    Background and Medical History

Cody Edgeston was born on December 23, 1995. (Tr. 154.) He was born three months

prematurely, and with underdeveloped lungs. (Tr. 92.) As a result, Cody experiences symptoms

of asthma. (Tr. 92.) Cody uses an Albuterol inhaler and Singulair to combat his asthma and

allergies. (Tr. 274.) He also uses a nebulizer infrequently. (Tr. 274.) He was eleven years old

and in the fifth grade at the time of the hearing. (Tr. 154, 281.) He had recently received "okay"

grades (Bs, Cs, and a D). (Tr. 271.) His fifth grade teacher had expressed concern about his

fidgety classroom demeanor and short attention span. (Tr. 272.) At the hearing, his mother

testified that Cody enjoys gym class, playing outside, and basketball despite his asthma. (Tr.

276.) The ALJ suggested that Cody's problems with concentrating and sitting still during school

might be side effects of his asthma medication, and his mother agreed. (Tr. 273.) However, she

admitted that she had not seen a doctor to obtain medication for or find ways to mitigate these

side effects because Cody behaved perfectly well when she sat in on class and she did not

believe he needed medication for his hyperactivity.  (Tr. 273.)  She also stated that Cody had never been hospitalized for his asthma.  (Tr. 277.)  His mother testified that Cody got along with adults and kids at school, and was able to attend to his personal hygiene.  (Tr. 278.)  She also testified that he did household chores, but constantly needed to be reminded because he was "extremely forgetful".  (Tr. 278.)  Finally, she testified that Cody does his homework everyday, but requires lots of breaks.  (Tr. 278–79.)

Cody also testified at the hearing.  (Tr. 281–89.)  He stated that he had a number of friends at school, enjoyed playing sports, and that his inhaler was sufficient to control his asthmatic symptoms for the duration of a game or gym class.  (Tr. 282–83, 287).  He testified that he is able to take care of personal hygiene by himself, but needs to be reminded to do his chores.  (Tr. 285.)  Cody stated that he had trouble concentrating in school, but that he was able to focus on and finish his homework.  (Tr. 285–86.)  Finally, he stated that he could concentrate on a video game for a whole day and liked to watch movies.  (Tr. 286.)

In May 2002, Plaintiff brought Cody to the Child Development and Behavior Clinic in Rockford because of his behavioral problems at school and at home.  (Tr.147.)  Dr. Cupoli, a developmental pediatrician, evaluated Cody to determine the cause of his hyperactivity.  (Tr. 147.)  Although Dr. Cupoli noted Cody's hyperactivity, he concluded that Cody's difficulties likely were due to the demanding curriculum in his school and  inconsistencies between the levels of structure and discipline provided by his mother and grandmother.  (Tr. 147.)  Dr. Cupoli recommended more consistent structure and routines for Cody.  (Tr. 147.)

In October 2004, Dr. Griffith, a psychologist, conducted a clinical assessment of Cody to address behavior problems at home and school.  (Tr. 147–51.)  He administered tests to Cody's

mother, grandmother, and teacher that asked them to rate Cody in different areas. (Tr. 149.) The results of these tests revealed significant elevations on hyperactivity, defiance, and impulsiveness scales. (Tr. 149.) Dr. Griffith also administered a number of tests to Cody. (Tr. 148.) He scored within the average range for his age level on standardized tests, but Dr. Griffith reported that his overall score was somewhat misleading due to the significant scatter across scores measuring individual areas of intellectual function. (Tr. 150.) For example, Cody demonstrated below average verbal thinking and reasoning skills, borderline nonverbal thinking and reasoning skills, average working memory skills, and high processing speeds. (Tr. 150.) Dr. Griffith reported that Cody's scores in working memory and processing speed were inconsistent with a diagnosis of Attention Deficit Hyperactivity Disorder (hereinafter "ADHD").[1] (Tr. 150.) He opined that Cody had a low threshold for over stimulation, which interfered with his ability to cope with complex situations such as the classroom and when his mother and grandmother's expectations were in conflict. (Tr. 150.) Dr. Griffith diagnosed him with sensory modulation disorder–low threshold type and unspecified disturbance conduct.[2] (Tr. 150.) He recommended consistent structure, routines, and discipline. (Tr. 150).

---

[1]"The essential feature of ADHD is a persistent pattern of inattention and/or hyperactivity/impulsivity that is more frequent and severe than is typically observed in individuals at a comparable level of development." *Diagnostic and Statistical Manual of Mental Disorders Text Revision* 85 (4th ed., American Psychiatric Association 2000) (hereinafter *"DSM–VI–TR"*).

[2]Sensory modulation disorders present "difficulties in regulating and organizing the type and intensity of behavioral responses to sensory input to match environmental demands." Ayelet Ben–Sasson et al., *A Meta Analysis of Sensory Modulation Symptoms in Individuals with Autism Spectrum Disorders*, 39 J. of Autism and Developmental Disorders 1, 2 (2007). Unspecified disruptive conduct is a general classification of disorders "characterized by conduct or oppositional defiant behaviors that do not meet the criteria for Conduct Disorder or Oppositional Defiant Disorder, but in which there is clinically significant impairment." *DSM–IV–TR* at 103.

In April 2005, Dr. Schoberg, a pulmonary specialist, saw Cody for his asthma. (Tr. 154.) Dr. Schoberg described Cody's symptoms as post nasal drip, nasal congestion, occasional cough, and headache. (Tr. 154.) He noted that Cody had been coughing and had more difficulty breathing during heavy activity since the fall, but also noted that Plaintiff had declined to get Advair or Singulair for Cody as prescribed. (Tr. 208.) Plaintiff also declined to use the prednisone prescribed by Cody's pediatrician earlier that month to control his coughing. (Tr. 118.) Dr. Schoberg noted that Cody had normal lung capacity and increased residual volume, which is suggestive of air trapping.[3] (Tr. 157.) He diagnosed Cody with moderate persistent asthma and allergic rhinitis.[4] (Tr. 154.)

Dr. Schoberg, followed up with Cody four times over the subsequent 18 months. (Tr. 208–23.) In June 2005, he maintained his original diagnosis, but noted an obstructive defect with a decrease in all parameters compared to previous pulmonary tests. (Tr. 210–11, 222.) During that visit, he also noted Cody's poor compliance with daily medications. (Tr. 210–11.) In September 2005, Dr. Schoberg wrote that Cody had been doing very well, and noted his improvement in obstruction and airway resistance compared to previous tests. (Tr. 220.) In April 2006, he documented Cody's general well being, as well as his improvements in attending school, taking medication, and sleeping. (Tr. 212.) He also noted some chest restriction with significantly less airway obstruction. (Tr. 218.) In October 2006, Dr. Schoberg ran a final round

---

[3]Air trapping is "slow or incomplete emptying of gas from all or part of a lung on expiration and implies obstruction of the regional airways." *Stedman's Medical Dictionary* 42 (28th ed. 2006).

[4]Asthma is "an inflammatory disease of the lungs characterized by (in most cases) reversible airway obstruction." *Id.* at 169. Rhinitis is "inflamation of the nasal mucous membrane." *Id*. at 1690.

of pulmonary tests and found that Cody had normal total lung capacity with increased residual volume suggestive of air trapping, and that his volume flow loops were obstructed.[5] (Tr. 213.) Cody had some shortness of breath with activity, but Dr. Schoberg's diagnoses remained moderately persistent asthma and allergic rhinitis. (Tr. 213.)

During the 2004–2005 school year, when Cody was in the third grade, his administrator and former teacher at the Rainbow Academy completed a Teacher Questionnaire from the Bureau of Disability Determination Services (hereinafter "BDDS"). (Tr. 161.) He had taught Cody for one quarter and subsequently served as an administrator for three years while Cody attended the Rainbow Academy. (Tr. 163.) The administrator indicated that Cody had some serious trouble acquiring and using information, attending and completing tasks, and interacting and relating with others. (Tr. 166.) He indicated that Cody had no problem moving or manipulating objects. (Tr. 167.) Finally, he indicated that Cody frequently missed school due to illness. (Tr. 169.)

In July 2005, Dr. Aarti, a consulting physician, completed a Childhood Disability Evaluation Form at the request of the SSA. (Tr. 174–178.) The physician listed Cody's impairments as a history of prematurity, asthma, sensory modulation disorder, and unspecified disturbance of conduct. (Tr. 174.) He noted that Cody had less than marked limitations in the "domains" of acquiring and using information, attending and completing tasks, interacting and relating with others, caring for himself, and health and physical well–being. (Tr. 175–176.)

---

[5]Volume–flow loops display air flow "as it relates to lung volume during maximal inspiration from complete exhalation and during maximum expiration from complete inhalation." *Flow Rates, Lung Volumes, and Flow Volume Loops*, http://www.merck.com/mmpe/sec05/ch046/ch046b.html (last visited June 9, 2009).

Under the heading acquiring and using new information, he documented Cody's sporadic scores on standardized tests, excessive absences and tardies at school, problems retaining information, and limited ability to work independently on school–related tasks. (Tr. 175.) Under attending and completing tasks, he noted Cody's recent diagnosis of low–threshold sensory modulation disorder. (Tr. 175.) Under interacting and relating with others, he indicated that Cody possessed adequate communications skills, but also indicated that he had problems using verbal and physical aggression towards adults, seeking attention appropriately, managing his anger, and following rules. (Tr. 175.) Under caring for oneself, he documented Cody's poor frustration tolerance, patience, and coping skills. (Tr. 176.) Under health and physical well–being, he noted that Cody had asthma, had never visited the emergency room, and that his school only reported a problem with absences. (Tr. 176.) Dr. Aarti noted no problems with Cody's ability to move and manipulate objects. (Tr. 176.) He concluded that Cody's problems were severe, but that they did not meet, medically equal, or functionally equal the listings.[6] (Tr. 178.)

In September 2005, Dr. Hoffman, a psychiatrist, evaluated Cody and reviewed the SSA Teacher Questionnaire that the Rainbow Academy administrator completed during the previous school year. (Tr. 185.) Dr. Hoffman reported that Cody was polite and inquisitive, and that his school attendance had improved since he began attending Luther Academy. (Tr. 185.) He stated that Cody was not hyperactive, but tended to be hyper after taking his asthma medication. (Tr.

---

[6]"The listings" refer to the SSA's Listing of Impairments, which "describes, for each major body system, impairments considered severe enough to prevent an individual from doing any gainful activity (or in the case of children under age 18 applying for SSI, severe enough to cause marked and severe functional limitations)." *Social Security Administration Disability Evaluation:  Listing  of Impairments*, http://www.ssa.gov/disability/professionals/bluebook/listing-impairments.htm (last visited June 9, 2009).

185.)  He reported that Cody's mental status was normal and that he was making and getting

along with friends at his new school.  (Tr. 186.)  He also reported that Cody played football, was

a member of the chess club, and did chores such as cleaning his room, taking out the garbage,

and vacuuming.  (Tr. 186.)  Dr. Hoffman diagnosed Cody as having superior intelligence (based

solely on his impressions), a history of asthma, and no psychiatric problems.  (Tr. 186.)

In October 2005,  Cody's fourth grade teacher at the Luther Academy completed a BDDS

Teacher Questionnaire after teaching him for six weeks.  (Tr. 191–98.)  The teacher indicated

that Cody had slight problems acquiring and using information and in caring for himself.  (Tr.

192, 196.)  Specifically, she wrote that Cody often needed directions repeated and required extra

help, but not to an unusual degree.  (Tr. 192, 193, 196.)  She indicated that Cody had no

problems attending and completing tasks, interacting and relating to others, or moving and

manipulating objects.  (Tr. 195.)  She also wrote that Cody occasionally used his inhaler during

exertion.  (Tr. 196.)  Finally, the teacher indicated that Cody did not miss school frequently due

to illness.  (Tr. 196.)

In November 2005, Dr. Cosme, a consulting physician, completed a Childhood Disability

Evaluation Form at the request of the SSA.  (Tr. 199–204.)  He listed Cody's impairments as a

history of asthma and unspecified conduct disorder.  (Tr. 199.)   He noted that Cody had less

than marked limitations in the domains of acquiring and using information, caring for himself,

and health and physical well–being.  (Tr. 201–02.)  He found that Cody had no problems in the

domains of attending and completing tasks and interacting and relating with others.  (Tr.

201–02.)  Based on his observations and Cody's records, the physician concluded that Cody does

have severe problems, but that they did not meet, medically equal, or functionally equal the

8

listings.  (Tr. 199.)

In June 2007, Cody visited Dr. Ortega, his pediatrician, after his fifth grade teacher wrote a letter that described his problems with sitting still in the classroom and recommended that he be tested by a doctor.  (Tr. 250, 251.)  Dr. Ortega diagnosed Cody with ADHD based on information from Cody's teacher, a questionnaire, and personal observations.  (Tr. 250.)   In September 2007, Dr. Shoberg wrote a letter requesting that Cody be excused from football until he had completed treatment for his recently exacerbated asthma.  (Tr. 252.)

## IV.    Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence.  42 U.S.C. § 405(g).  The ALJ's legal conclusions are reviewed de novo.  *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997).  However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]."  *Id*.  The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner.  *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.").

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm.  42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion."  *Binion*, 108 F.3d at 782.  If the ALJ identifies supporting

evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## V.    Framework for Decision

A person under the age of 18 is "disabled" if he does not engage in substantial gainful employment and "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

The Commissioner proceeds through three steps in determining whether a claimant under the age of 18 is disabled. *See* 20 C.F.R. § 416.924(a)–(d). The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; and (3) whether the impairment meets, medically equals, or functionally equals the listings. 20 C.F.R. § 416.924(b)–(d). To determine whether the impairment functionally equals the listings, the Commissioner considers how the child functions in six domains: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objections; (v) caring for his or herself; and (vi) health and

physical well–being. 20 C.F.R. § 416.926a(b)(1). A child must have "marked" limitations in at least two of the domains, or an "extreme" limitation in one domain, to have an impairment that functionally equals the listings. 20 C.F.R. § 416.926a(a). The Court analyzes each step in the framework to determine whether the Commissioner's decision was supported by substantial evidence.

## VI.    Analysis

### A.    Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 416.910. If the claimant is engaged in substantial gainful activity, he or she is found not to be disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ found that Cody did not engage in substantial gainful activity at any time relevant to the decision. (Tr. 20.) Neither party disputes this determination. As such, the ALJ's Step One determination is affirmed.

### B.    Step Two: Does the Claimant Suffer From a Severe Impairment?

Step Two requires a determination whether the claimant is suffering from a severe impairment.[7] A severe impairment is one which is more than a slight abnormality or

---

[7] The claimant need not specify a single disabling impairment, as the Commissioner will consider combinations of impairments. *See, e.g.*, 20 C.F.R. § 416.920(c). To simplify, this generic discussion of the Commissioner's decision–making process will use the singular "impairment" to include both singular and multiple impairments.

combination of slight abnormalities, and that causes more than minimal functional limitations. 20 C.F.R. § 416.924(c). If the claimant suffers a severe impairment, then the inquiry moves to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

The ALJ found that Cody had the following severe impairment: asthma. (Tr. 20.) Neither party disputes this determination. Thus, the ALJ's Step Two determination is affirmed.

## C.    Step Three: Does Claimant's Impairment Meet, Medically Equal, or Functionally Equal an Impairment in the Commissioner's Listing of Impairments?

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. § 416.925(a). Neither party disputes the ALJ's finding that Cody does not meet or medically equal the listing for asthma. Thus, the ALJ's determination in that regard is affirmed.

To determine whether an impairment functionally equals a listing, the Commissioner considers the child's limitations across six domains: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objections; (v) caring for his or herself; and (vi) health and physical well–being. 20 C.F.R. § 416.926a(b)(1). A child must have marked limitations in two of the domains, or an extreme limitation in one domain, to have an impairment that functionally equals the listings. 20 C.F.R. § 416.926a(a).

A "marked" limitation is one where the impairment interferes with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). A "marked" limitation is also characterized as "more than moderate" but "less than extreme." *Id*. The

regulations further state that a child has a "marked" limitation if he or she has a "valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and [the child's] day to day functioning in domain–related activities is consistent with that score." *Id*.

An "extreme" limitation is one where the impairment *very* seriously interferes with the child's "ability to independently initiate, sustain, or complete activities" in a domain. 20 C.F.R. § 416.926a(e)(3). An "extreme" limitation is "more than marked." *Id*. Also, a child has an "extreme" limitation if he or she tests at least three standard deviations below the mean on a standardized test designed to measure ability or functioning in a domain. *Id*.

In this case, the ALJ determined that Cody's impairment did not functionally equal the listings. (Tr. 28.) To functionally equal the listings, Cody's limitations would have to be marked in at least two of the domains, or extreme in at least one domain. The ALJ found less than marked limitations in two of the domains, and no limitations in the other four domains. (Tr. 24–28.)

First, the ALJ found that Cody had no limitations in the "acquiring and using information" domain. (Tr. 24.) This domain considers how well a child is able to acquire or learn information, and how well a child uses the information he has learned. 20 C.F.R. § 416.926a(g). The ALJ relied on Cody's average standardized test scores in October 2004 and average grades in 2005. (Tr. 24.) She also relied on Dr. Hoffman's September 2005 evaluation, which noted Cody's superior intelligence. (Tr. 24.) Finally, the ALJ noted that Cody's teachers did not indicate that he had limitations in this domain. (Tr. 24.) The ALJ concluded that

substantial evidence existed in the record to find that Cody had no limitations in this domain

Second, th ALJ found that Cody had no limitations in the "attending and completing tasks" domain. (Tr. 25.) This domain considers how well a child is able to focus and maintain attention, and how well he is able to begin, carry through, and finish activities, including the pace at which he performs activities and the ease of changing activities. 20 C.F.R. § 416.926a(h)(2)(iv). The ALJ acknowledged that a doctor had noted Cody's hyperactivity when he was in kindergarten, but gave more weight to Dr. Griffith's October 2004 testing and evaluation which did not support a diagnosis of ADHD. (Tr. 25.) Although the ALJ considered Plaintiff's statements that Cody had trouble sitting still in class, she relied more heavily on Plaintiff's statement that he behaved well when she observed the class. (Tr. 25.) She also noted Cody's testimony that he had some trouble focusing, but that he always got his homework done right away, and that he could concentrate on a video game all day. (Tr. 25.) Finally, the ALJ observed that Cody sat through the hearing without fidgeting and responded appropriately to all questions. These findings led the ALJ to determine that Cody had no limitations in this domain.

Third, the ALJ found that Cody had no limitations in the "interacting and relating with others" domain. (Tr. 26.) This domain considers how well a child is able to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others. 20 C.F.R. § 416.926a(i). The ALJ acknowledged Cody's behavioral problems in the past, but found significant that neither his teachers nor his mother identified current behavioral problems. (Tr. 26.) She also found that he had no problems interacting with his friends or adults. (Tr. 26.) From this evidence, the ALJ concluded that Cody had no limitation in this

domain.

Fourth, the ALJ determined that Cody had less than marked limitations in the "moving and manipulating objects" domain. (Tr. 26.) This domain considers how well a child is able to move his body from one place to another and how a child moves and manipulates objects. 20 C.F.R. 416.92a(j). The ALJ acknowledged Cody's asthma, but relied on Cody's ability to play sports and be a member of the basketball team. (Tr. 26.) She also relied on Plaintiff's testimony that Cody had not missed school due to his asthma that year. (Tr. 26.) Finally, the ALJ noted that Cody had never been hospitalized for his asthma, and that pulmonary tests indicated that it was only moderate in severity and responsive to medication. (Tr. 26.) Despite Cody's asthma, the ALJ found his limitations in this domain are less than marked. (Tr. 26.)

Fifth, the ALJ determined that Cody had no limitations in the "care for himself" domain. (Tr. 27.) This domain considers how well a child maintains a healthy emotional and physical state, including how well a child satisfies his physical and emotional wants and needs in appropriate ways. 20 C.F.R. § 416.926a(k). This includes how the child copes with stress and changes in the environment and whether the child takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k). The ALJ noted that Plaintiff did not allege any limitations in this domain and that none are indicated by the record. (Tr. 27.) Accordingly, the ALJ found that Cody has no limitations in his ability to care for himself. (Tr. 27.)

Finally, the ALJ determined that Cody has less than marked limitations in the "health and physical well–being" domain. (Tr. 27.) This domain considers the cumulative physical effects of physical and mental impairments and any associated treatments or therapies on a child's functioning that were not considered in the evaluation of the child's ability to move about and

15

manipulate objects.  20 C.F.R. § 416.926a(1)(3).  The ALJ acknowledged that Cody had some

limitations because of his asthma.  (Tr. 28.)  However, she noted that Cody had never been

hospitalized for his asthma, he only used his nebulizer on rare occasions, and his asthma was

well–controlled when he followed proper treatment.  (Tr. 28.)  From this evidence, the ALJ

found that Cody's limitations were less than marked in this domain.  (Tr. 28.)

Neither party disputes the ALJ's findings regarding the  acquiring and using information,

moving and manipulating objects, caring for himself, and health and physical well–being

domains.  Those findings are supported by substantial evidence in the record.  The ALJ relied on

Cody's medical records and teacher evaluations.  She also weigh Cody's and Plaintiff's

testimonies at the hearing.  She found that Cody had been receiving average grades, was

responsive to asthma medications, was able to play sports, was able to independently take care of

personal hygiene, had never been hospitalized for an asthma attack, and rarely used his

nebulizer.  The ALJ ignored reports from Cody's teacher and mother that suggested that he had

was forgetful and often had to have instructions repeated.  Although these facts may suggest that

Cody  had some limitations in his abilities to acquire and use information, such limitations were

less than marked at best.

The ALJ created a logical bridge from these factual findings to her conclusion.  She gave

many examples of conditions listed in 20 C.F.R. 416.926a(g)–(l) that constitute an impairment in

each domain, and then contrasted Cody's impairments in each domain.  After weighing the

evidence, the ALJ found that although Cody's impairments could reasonably be expected to

produce the alleged symptoms, "the statements concerning the intensity, persistence and limiting

effects of [Cody's] symptoms [were] not entirely credible."  (Tr. 22.)   Furthermore, neither party

contests the ALJ's findings in these domains, and thus, they are affirmed.

The ALJ's determination that Cody's impairments were less than marked in the "interacting and relating to others" domain was supported by substantial evidence in the record. The ALJ noted Plaintiff's testimony that Cody got along with adults and children at school, and Cody also testified that he had a number of friends at his new school. (Tr. 278, 282–83.) The ALJ noted Cody's history of behavioral problems at an earlier age, but after weighing conflicting evidence, she reasonably concluded that his limitations in this domain were negligible based on evidence of his recent behavior. (Tr. 26.) Specifically, in October 2004, Dr. Griffith diagnosed Cody with an unspecified disturbance of conduct, which is a classification of behavioral disruptions that do not rise to the level of Conduct or Oppositional Defiance Disorder. (Tr. 150; *DSM–VI–TR* at 103.) Later that year, an administrator from Cody's school indicated that Cody had serious trouble interacting and relating with others. (Tr. 166.) The following year, a consulting physician noted that Cody possessed adequate communication skills when interacting with others, but had some problems with showing aggression towards adults and managing his anger. (Tr. 175.) However, he concluded that Cody had less than marked limitations in this domain. (Tr. 178.) In September 2005, an examining psychiatrist noted that Cody was polite and inquisitive, and was making and getting along with friends at his new school. (Tr. 186.) Also in fall 2005, Cody's fourth grade teachers and another consulting physician found that Cody had no problems interacting and relating with others. (Tr. 195, 201–02.) The above evidence was sufficient for a reasonable mind to conclude that Cody's limitations in interacting and relating with others were less than marked. Accordingly, the ALJ's findings are supported by substantial evidence in the record. The ALJ also created a logical bridge between that

17

evidence and her conclusions.  Thus, the ALJ's decision is affirmed.

The ALJ's determination that Cody had no impairments in the  "attending and completing tasks" domain was supported by substantial evidence in the record.  The ALJ must base her conclusions on substantial evidence in the record, and she is free to resolve conflicts in medical evidence. *Barnhart*, 384 F.3d at 369*; Perales*, 402 U.S. at 399.  In May 2002, Dr. Cupoli noted that Cody had some behaviors consistent with hyperactivity, but attributed his problems to inconsistent demands by his mother and grandmother.  (Tr. 147.)  In October 2004, Dr. Griffith noted that Cody's test scores showed elevations in hyperactivity and impulsiveness, but concluded that his behaviors and test scores were not consistent with a diagnosis of ADHD.  (Tr. 150.)  Later that school year, an administrator at Cody's school noted that Cody had serious troubles attending and completing tasks, but also noted that he frequently fell behind because of excessive absences.  (Tr. 166, 169.)  In July 2005, a consulting physician noted Cody's excessive absences and problems working independently at school, but concluded that Cody's limitations in that domain were less than marked. (Tr. 175–76.)  In September 2005, Dr. Hoffman noted that Cody was not hyperactive, but tended to be more hyper after taking his asthma medication.  (Tr. 185.)  He noted Cody's superior intelligence and diagnosed him with no psychiatric problems.  (Tr. 186.)  Later that fall, both Cody's fourth grade teacher and a consulting physician indicated that Cody had no problems attending and completing tasks.  (Tr. 195, 201–202.)  At the administrative hearing in March 2007, Plaintiff testified that Cody's teacher was concerned about his fidgeting in class, but also stated that he had recently received "okay" grades and behaved perfectly well when she observed his class.  (Tr. 271–72, 273.)  When the ALJ suggested that Cody's hyperactivity might be a side effect of his asthma medication, Plaintiff

agreed, but stated that she did not believe Cody required medication for his hyperactivity.  (Tr. 273.)  Cody and his mother both testified that he needed to be reminded to do his chores.  (Tr. 278, 285.)  Finally, Cody testified that he was able to concentrate on his homework and watch movies, and speculated that he could concentrate on a video game for a whole day.  (Tr. 285–86.)  Based on substantial evidence that was before her, the ALJ reasonably concluded that Cody was not limited in his ability to attend to and complete tasks.  The ALJ also created a logical bridge from her factual findings to her conclusion because she gave many examples of conditions listed in 20 C.F.R. 416.926a(g)–(l) that constitute an impairment in each domain, and then contrasted Cody's impairments in each domain.

After the ALJ issued her opinion, Cody saw Dr. Ortega, his pediatrician, regarding his hyperactivity.  At that time, Dr. Ortega diagnosed Cody with ADHD in response to his personal observations, a questionnaire, and a teacher's concern about his hyperactivity.  (Tr. 250.)  He prescribed medication for a trial period.  (Tr. 250.)  Plaintiff agreed to consider the diagnosis and let Dr. Ortega know if she wished to put Cody on medication.  (Tr. 250.)  Plaintiff also submitted a doctor's note that requested Cody be excused from football because of his asthma.  (Tr. 252.)  Plaintiff submitted documentation of these events to the Appeals Council for review, and they are now part of the administrative record.  As a general rule, the court does not consider evidence added to the record after the ALJ's decision when determining whether that decision was supported by substantial evidence.  *Eads*, 983 F.2d at 817.  However, 42 U.S.C. § 405(g) authorizes the court to remand a case to the SSA for consideration of new evidence when it is material and when the claimant has good cause for failing to incorporate it into the record prior to the proceeding.

The new evidence is not material. Dr. Ortega diagnosed Cody's condition 27 months subsequent to the alleged onset date. (Tr. 247–51.) He based his diagnosis on a report from Cody's sixth grade teacher, a questionnaire, and his personal observations. Furthermore, Dr. Ortega was Cody's pediatrician, and all psychological and behavioral specialists who examined or tested Cody declined to diagnose him with ADHD. Also, Cody's teachers gave inconsistent reports about his behavior throughout the record. Thus, Dr. Ortega likely relied too heavily on a single teacher's report when he diagnosed Cody with ADHD. The court must also consider the effects of medications for an alleged impairment. 20 C.F.R. § 416.924a(b)(9). Although Dr. Ortega prescribed a trial of ADHD medication, the record indicates that Plaintiff only agreed to consider giving Cody medication. (Tr. 250.) Thus, the court has no basis to determine whether the prescribed medication would mitigate Cody's symptoms. Finally, no treating or examining physician found Cody's limitations to be greater than those determined by the ALJ in each domain. Accordingly, the court does not find this new evidence significant enough to warrant remand. Even had the ALJ considered this evidence, substantial evidence in the record still exits to support her original conclusions. Thus, the court finds that Cody's latest diagnosis and asthmatic symptoms are not material to this decision, and declines to remand based on them.

The ALJ's determination that Cody's impairment does not meet, medically equal, or functionally equal the listing was based on substantial evidence in the record. In reviewing the evidence, the ALJ created a logical bridge from the record to her conclusion that Cody does not have marked or extreme limitations in any of the domains. Accordingly, the Claimant's motion for summary judgment is denied Commissioner's motion for summary judgment is granted.

## VII.    Conclusion

For the foregoing reasons, the Claimant's motion for summary judgment is denied and

Commissioner's motion for summary judgment is granted.

**E N T E R:**

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

**DATE**: June 23, 2009